UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges Friedman, Raphael and White
Argued at Richmond, Virginia

CHAD ALLAN GROOMS, S/K/A
  CHAD ALLEN GROOMS

v.      Record No. 0417-25-2

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE STUART A. RAPHAEL
DECEMBER 30, 2025

FROM THE CIRCUIT COURT OF LOUISA COUNTY
Timothy K. Sanner, Judge

(Bryan Jones; Bryan J. Jones, LLC, on brief), for appellant.
Appellant submitting on brief.

Jason D. Reed, Senior Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Challenging the sufficiency of the evidence, Chad Grooms appeals his convictions for

first-degree murder, use of a firearm in the commission of murder, concealing a dead body,

conspiracy to conceal a dead body, conspiracy to destroy evidence, and destroying evidence.  He

also claims that the trial court erred by admitting evidence that was unduly prejudicial.  Finding

no error, we affirm.

BACKGROUND

We recite the facts in the light most favorable to the Commonwealth, the party that

prevailed at trial.  *Camann v. Commonwealth*, 79 Va. App. 427, 431 (2024) (en banc).  "Doing

so requires that we 'discard' the defendant's evidence when it conflicts with the

Commonwealth's evidence, 'regard as true all the credible evidence favorable to the

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

Commonwealth,' and read 'all fair inferences' in the Commonwealth's favor." *Id.* (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

In July 2022, Chad Grooms asked his girlfriend, Sarah,[1] to deliver drugs for him. Sarah delivered crack cocaine to Don Estes, but Estes and Sarah used the drugs before Estes paid for them. Some of those drugs came from Grooms's personal supply, which Sarah took without asking, angering Grooms.

Later that week, Grooms asked his lifelong friend, Richard Buckner, to buy him a gun. Buckner bought a 9-millimeter handgun at a pawnshop.[2] Grooms paid Buckner $150. Grooms changed his phone number the same day.

On July 29, 2022, Grooms called Sarah on Facebook Messenger at 4:27 p.m. Not long after, Grooms broke a window at Sarah's house. Terrell Nicholas was there with her. Grooms shouted through the broken window, demanded that Sarah return his drugs, and eventually broke in. Grooms hit Sarah, cutting her chin, before Nicholas could separate them. The altercation was overheard by Susan Grimm, who lived in the house with Sarah.

Grooms called Sarah again the next day. Sarah asked her friend, Harmonie Harlow, to come over to her house because she was afraid of Grooms and did not want to be there alone. When Harlow arrived, Sarah told her that she had kicked Grooms out of the house and left his personal belongings on the porch.[3] Harlow noticed the cut on Sarah's chin. Sarah told her that Grooms had hit her the day before. Sarah and Harlow then left to pick up Nicholas and hang out, returning later that night. Grooms phoned Sarah again after midnight.

---

[1] We omit the victim's last name to protect the family's privacy.

[2] Grooms, a previously convicted felon, was not allowed to buy a gun.

[3] Grooms had other items in Sarah's home, including more clothes, mail, and drug paraphernalia.

On the drive home, Sarah told Harlow that she was afraid of Grooms. After Harlow dropped off Sarah at her house, Harlow heard what sounded like a gunshot or a car backfiring. Harlow messaged Sarah to confirm that she made it inside safely, but there was no response.

When Harlow, Nicholas, and Sarah were together earlier that evening, Grooms asked Buckner to meet him a few blocks away from Sarah's home. Grooms said he was going to kill Sarah because she stole his drugs. They separately drove to Sarah's house, where Grooms's brother, Stacy, was waiting. While Buckner and Stacy waited outside, Grooms went inside and Sarah ran out, screaming. Grooms shot Sarah several times at close range. One of the gunshots killed Sarah instantly.

Grooms told Buckner and Stacy that they had to get rid of Sarah's body. The three men carried her body to an unused tool shed before leaving the scene. Crime-scene photos show Sarah's crumpled body where it was tossed inside the shed.

A neighbor called 911 to report the gunshots. Police arrived and interviewed several neighbors. Many heard the gunshots and others saw cars driving away at high speed. The officers found a set of keys with a lanyard bearing Sarah's name. They recovered shell casings and a backpack with blood on it; they also observed puddles of coagulated blood. A K-9 unit was dispatched, and the police dog led the officers to the shed where Sarah's body was discovered.

After Sarah's murder, Grooms used his cellphone repeatedly to search the internet for information about himself, Sarah's death, and the police investigation. Grooms changed his cellphone number several times, including switching to a Utah area code. Grooms also downloaded a police-scanner app.

While keeping tabs on the investigation, Grooms also researched how to get rid of physical evidence, including his car. He looked up the price of black spray paint and how much

he would need to cover his champagne-colored 2000 Buick Regal. Grooms then painted the car black.

After fleeing to Maryland, Grooms was found and arrested in Baltimore and brought back to Virginia. While in jail, Grooms and his brother Stacy spoke daily on a recorded line. Grooms asked Stacy to get rid of the Buick. Stacy and Buckner contacted Corey Houchens, a mechanic and tow-truck driver. Houchens agreed to scrap the car.[4]

Police first spoke with Buckner in October 2022. He denied involvement in Sarah's murder and provided an alibi that he later recanted. Buckner worried that the Grooms brothers would kill him if he told the truth. Buckner eventually told the police about Sarah's murder, including how he and the Grooms brothers hid her body in the shed. Evidence recovered from Grooms's phone corroborated Buckner's account.

Grooms was indicted on charges of premeditated murder, use of a firearm in the commission of murder, possession of a firearm as a previously convicted felon, concealing a dead body, and related conspiracy charges. Sarah's friends and Buckner testified at the March 2024 jury trial to the facts set forth above. Buckner had been charged as an accessory after the fact and for concealing a dead body; he testified for the Commonwealth without a plea agreement. The trial court denied Grooms's motions to strike.

The jury found Grooms guilty of all charges, and the trial court sentenced him to life in prison plus 23 years, with 10 years suspended. Grooms noted a timely appeal.

ANALYSIS

Grooms challenges the sufficiency of the evidence supporting his convictions. He argues that the court abused its discretion by admitting statements from other witnesses about what

---

[4] The car was titled in Buckner's name, so Buckner signed over the title to Houchens. Buckner owned the car and paid for insurance, but he did not use it himself. He let Grooms use it as a favor.

Sarah told them in the days before her murder. He also argues that the trial court abused its discretion by admitting evidence of Grooms's prior acts of violence. We consider those claims in turn, but we start with Grooms's procedural default as to one of his convictions.

*A. Grooms has defaulted his appeal of the felony destruction-of-evidence conviction.*

Each charge against Grooms in the trial court was assigned its own case number. Grooms's notice of appeal listed his convictions for first-degree murder (CR23000045-01), use of a firearm in the commission of a murder (CR23000045-02), concealing a dead body (CR23000045-04), conspiracy to conceal a dead body (CR23000102-02), and conspiracy to destroy evidence of a felony (CR23000102-01). But it omitted his conviction for felony destruction of evidence (CR23000068-00). Grooms submitted an amended notice of appeal to add that conviction. But that was seven months later, and his amended notice of appeal was filed without leave of court.

"[T]wo aspects of a notice of appeal are mandatory substantive requirements: a notice of appeal must be timely filed, and it must 'adequately identif[y] the case to be appealed.'" *Evans v. Commonwealth*, 61 Va. App. 339, 345 (2012) (second alteration in original) (quoting *Roberson v. Commonwealth*, 279 Va. 396, 407 (2010)). Grooms's original notice of appeal, though timely, "is insufficient to identify," *id.*, his felony destruction-of-evidence conviction (CR23000068-00). And his amended notice of appeal filed without leave of court 7 months later was untimely because it was not filed "within 30 days after entry of final judgment." Rule 5A:6(a). Accordingly, we dismiss his challenge to that conviction.

*B. The trial court did not err by admitting Sarah's statements before her murder (Assignment of Error I).*

Grooms claims that Sarah's statements as recounted by the Commonwealth's witnesses were inadmissible hearsay. He disputes Sarah's comments that she put Grooms's belongings on

her front porch, that she was afraid Grooms would hurt her, and that Grooms assaulted her in the days before the murder.

Statements "that show the victim's state of mind are admissible as an exception to the hearsay rule, *provided the statements are relevant and probative of some material issue in the case*." *Hodges v. Commonwealth*, 272 Va. 418, 436 (2006) (quoting *Clay v. Commonwealth*, 262 Va. 253, 257 (2001)). Accounts about a victim's state of mind can be relevant to whether "the killing was willful, deliberate, and premeditated" in a first-degree murder charge. *Clay*, 262 Va. at 257. Testimony recounting a victim's statements about being physically abused by the defendant and wanting to leave him, when relevant, is also admissible. *Jordan v. Commonwealth*, 84 Va. App. 446, 466 (2025); *see also Khine v. Commonwealth*, 75 Va. App. 435, 445-46 (2022) (admitting testimony that the victim told the witness she was planning to leave the defendant, demonstrating the defendant's motive to kill her).

Sarah's statements to others showed her desire to leave Grooms and explained why she feared him. Her account about leaving Grooms's belongings on her porch showed that she wanted to end the relationship. *Accord Khine*, 75 Va. App. at 445. Her comments about stealing his drugs and the physical abuse she suffered at his hands showed her fear of him. *Jordan*, 84 Va. App. at 466. Those statements were made only days or hours before Sarah's murder and were relevant to show Grooms's motive to kill her. Thus, the trial court did not abuse its discretion in admitting those statements.

### C. The trial court did not err by admitting evidence of Grooms's violence toward Sarah (Assignment of Error II).

Virginia Rule of Evidence 2:404 governs the admissibility of prior-bad-act evidence. It states that "evidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith." Va. R. Evid. 2:404(b). Prior-bad-act-evidence is admissible, however, "if it tends to prove any

relevant fact pertaining to the offense charged, such as where it is relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, accident, or if they are part of a common scheme or plane." *Id.* Rule 2:404(b) "permits the introduction of otherwise admissible prior-bad-act evidence only 'if the legitimate probative value of such proof outweighs its incidental prejudice.'" *Williams v. Commonwealth*, 85 Va. App. 718, 734 (2025) (quoting Va. R. Evid. 2:404(b)).

We reject Grooms's claim that the trial court should have excluded witness testimony about his physical altercations with Sarah. The evidence showed that Grooms planned to hurt Sarah and that she was afraid of him. Susan Grimm testified that she overheard Grooms tell Sarah, "I'm going to kill you," the same weekend she was murdered. Another witness, Sherry Thacker, related that Sarah took Grooms's drugs, that he had struck her because of it, and that she was afraid of him. Shortly before her murder, Grooms broke a window in Sarah's home and attacked her. Nicholas was present, and he had to physically separate Grooms and Sarah. Seeing Sarah's injuries the night she was murdered, Harlow recounted Sarah's statement that Grooms had hit her. Evidence of Grooms's escalating violence toward Sarah was probative, quite simply, of his malice, motive, and intent to kill her. Va. R. Evid. 2:404(b).

Moreover, the trial court steered clear of evidentiary error by giving the jury a cautionary instruction to consider Grooms's other violent acts "only" as evidence of his motive, intent, and feelings toward Sarah. Courts generally presume that jurors follow such instructions. *Teleguz v. Commonwealth*, 273 Va. 458, 480 (2007). We see no reason not to do so here.

In short, the trial court did not abuse its discretion by admitting evidence of Grooms's prior acts of violence toward Sarah.

*D. The trial court did not err in denying Grooms's motions to strike (Assignment of Error III).*

Finally, Grooms argues that the trial court should have granted his motion to strike because the Commonwealth failed to prove his guilt beyond a reasonable doubt and because Buckner's testimony was inherently incredible. We are not persuaded.

When reviewing challenges to the sufficiency of the evidence, we consider the evidence in the light most favorable to the Commonwealth, the prevailing party below, and will reverse the trial court's judgment only when its decision is plainly wrong or without evidence to support it. *E.g.*, *Sarka v. Commonwealth*, 73 Va. App. 56, 62-63 (2021). The relevant question is whether any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *Tatusko v. Commonwealth*, 79 Va. App. 721, 736 (2024).

For testimony to be inherently incredible, it must be either so false that a reasonable person could not believe it, or it must be shown to be false by contrary evidence. *Commonwealth v. Perkins*, 295 Va. 323, 327-28 (2018); *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006). A legal determination that a witness is inherently incredible is different "from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). Determining whether a witness is inherently incredible is a matter for the factfinder, and we rarely disturb that determination. *Id.* at 626-27.

The evidence here sufficed for a reasonable trier of fact to conclude beyond a reasonable doubt that Grooms planned Sarah's murder, killed her, and tried to cover it up. Buckner testified that he was with Grooms the night Grooms killed Sarah. Buckner walked the jury through what happened. Buckner bought the gun for Grooms, drove with him to Sarah's home, heard Grooms fire the gun, and then helped Grooms and his brother hide Sarah's body in the shed.

We reject Grooms's claim that Buckner's testimony was inherently incredible because it was inconsistent with his initial police interview. Buckner was a lifelong friend of Grooms. But

- 8 -

he also feared him.  Buckner initially told police a version of events that he later recanted.  The jury heard both versions and was free to decide for itself that he was telling the truth about Grooms's crimes.  Buckner's testimony, moreover, was not contradicted by the Commonwealth's other evidence.  *See Perkins*, 295 Va. at 327-28.  To the contrary, Buckner's testimony corroborated the physical and digital evidence that Grooms killed Sarah.  In short, the trial court did not err in refusing to strike the Commonwealth's evidence.

CONCLUSION

Having considered Grooms's assignments of error, we find none meritorious.  We dismiss Grooms's appeal of his felony destruction-of-evidence conviction (CR23000068-00) and find no basis to disturb his other convictions.

*Affirmed in part and dismissed in part.*